IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DAVID MICHAEL BOMBER, ) | |
| Petitioner, ) | Civil Action No. 7:16CV00171 |
| v. ) | |
| ) | By: Elizabeth K. Dillon |
| HAROLD W. CLARKE, ) | United States District Judge |
| Respondent. ) | |

**MEMORANDUM OPINION**

David Michael Bomber, a Virginia inmate proceeding *pro se*, filed this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging the validity of his confinement on a judgment by the Circuit Court of the City of Roanoke. Respondent filed a motion to dismiss, and Bomber responded, making the matter ripe for disposition. Having reviewed the record, the court concludes that the motion to dismiss must be granted.

I.  BACKGROUND

The Circuit Court of the City of Roanoke made the following factual findings in addressing Bomber's state habeas petition:

> On June 5, 2010, the Petitioner, David Michael Bomber, spent the late morning and afternoon at the swimming pool at his apartment complex. Tammy Kregger, her then-two-year-old daughter, A.K., Kristen Snow, Mike Worrell, and Velvie Proffitt were all at the swimming pool as well. Kregger and her daughter did not know [Bomber].
>
> Kregger noticed [Bomber] and another man watching her from across the pool as her little girl played near the "kiddie pool." At some point, [Bomber] told his acquaintance Kristen Snow, that he "could tap that," referring to Kregger. [Bomber] "stumbled and tripped" towards Kregger and her daughter, and, without receiving Kregger's permission, picked up her two-year-old. Kregger smelled alcohol on [Bomber's] breath. [Bomber] told Kregger he was going to put her child in the pool. Kregger immediately protested, telling [Bomber] her daughter did not know how to swim and was not wearing her "floaties." [Bomber] did not put the child in the pool, but continued holding her. Kregger's daughter was frightened and told [Bomber] repeatedly, "My daddy will be home real soon."

[Bomber] eventually released the two-year-old and turned his attentions to Kregger.

[Bomber] approached Kregger, telling her she was pretty and telling her to smile. He pinned Kregger against the chain-link fence that surrounded the pool, pressing his crotch against Kregger's leg. Kregger's daughter witnessed this interaction, and continued to tell [Bomber] that her "daddy [would] be home real soon." [Bomber] released Kregger after Snow intervened and [Bomber's] girlfriend, Proffitt, began pulling on Kregger's arm and yelling at her. Snow told [Bomber's] companions, Proffitt and Worrell, that they needed to "get [Bomber] out of here." Kregger took her little girl and went home. About ten or twenty minutes passed between Kregger leaving the pool and hearing sirens at the apartment complex.

As [Bomber] was leaving the pool, he "started screaming derogatory remarks" about Kregger. Snow told [Bomber] that there were families at the pool and "he didn't need to be talking like that." In response, [Bomber] "got in [Snow's] face" and shoved her, so that she tripped over a chair and landed against the chain link fence.

Worrell stepped in between [Bomber] and Snow and apologized to her. Worrell guided [Bomber] away from the pool because [Bomber] was "stumbling from drinking."

Worrell had met [Bomber] and [Bomber's] girlfriend, Proffitt, that day at the pool. The three of them spent the afternoon together sitting by the apartment pool talking, "partying," and drinking. When the three left the pool, they went to [Bomber's] apartment.

According to [Bomber] and his girlfriend Proffitt, Worrell drank heavily and exhibited erratic behavior throughout the day. The couple claimed Worrell's behavior culminated when Worrell, who they claimed was distraught regarding his experiences as a combat Marine stationed overseas, attacked [Bomber] that evening when they were all in [Bomber's] apartment. Both Proffitt and [Bomber] claimed [Bomber] stabbed Worrell in self-defense. According to [Bomber] and Proffitt, Worrell became agitated during a discussion and put [Bomber] in a headlock. At trial, Proffitt testified that, after [Bomber] "escaped" from the headlock, [Bomber] went to the kitchen and armed himself with a knife; when Worrell approached [Bomber], [Bomber] stabbed Worrell.

[Bomber] stabbed Worrell in the upper chest, near his clavicle. The knife injured Worrell's upper left lung and his anterior left ventricle. According to Proffitt, who witnessed the stabbing, [Bomber] pulled the knife out of Worrell and "threw it." Worrell then "staggered" and fell back onto the couch. When Proffitt told Worrell to get up, he did so despite the blood "pouring out" of his wound. Proffitt and [Bomber] left Worrell standing between the kitchen and living room while they went to get some towels to try to stop the bleeding. Worrell collapsed.

After some discussion, Proffitt told [Bomber] to leave the apartment, and, after he left, Proffitt called 9-1-1. As [Bomber] fled, he sideswiped a parked car in the apartment parking lot, and continued to flee. Police later apprehended [Bomber] at a friend's house. According to Snow, "about five or ten minutes" elapsed between the time she saw [Bomber] and Worrell leave the pool and her

2

hearing [Bomber] hit a parked car. Snow saw [Bomber] speed away after hitting the car.

[Bomber] texted his childhood friend, Anthony Hartwell, sometime around 7:35 on the evening of June 5. The text message from [Bomber] stated, "I'm in a lot of trouble." When Hartwell arrived home that evening, [Bomber] was already at Hartwell's home and had gone inside to borrow a pair of shorts from Hartwell. [Bomber] was sitting in his car crying when Hartwell arrived. When Hartwell asked [Bomber] what was wrong, [Bomber] responded that, "he didn't want to talk about it." [Bomber] later left his car and, after helping the Hartwells prepare for their son's birthday party the next day, lay down on their couch and went to sleep.

Melissa Hartwell, Anthony's wife, showed Hartwell the shoes and shorts [Bomber] left in their bedroom when he changed. "The shoes had a little blood on the fronts of them. And the shorts just the front of them was pretty much blood soaked." Hartwell removed the shoes and clothing from his bedroom and left them in the foyer. When Hartwell again asked [Bomber] what was going on, [Bomber] "said that he thought he had hurt somebody."

Melissa Hartwell became concerned [Bomber] would harm himself because [Bomber] "had been crying for hours at that point." Melissa Hartwell called 9-1-1 and both the Roanoke County and Roanoke City Police Departments responded. Officer Dennis Gardner of the Roanoke County Police Department took [Bomber] into custody and searched [Bomber] incident to arrest, finding [Bomber's] Blackberry. Officer Gardner also seized [Bomber's] bloodstained shoes.[1] [Bomber] had put his bloodstained shorts back on.

In the meantime, Proffitt told the 9-1-1 dispatcher that Worrell attempted to commit suicide by stabbing himself in the chest – a story she repeated to the police upon their arrival. Worrell, however, was still conscious and told the officers that he had not attempted suicide but had been stabbed.

At the hospital that night, the trauma team performed a procedure called a "floor economy" and opened Worrell "up between two ribs" to try to control the heavy bleeding from his stab wound. Worrell "had a prolonged resuscitation and required numerous blood transfusions" and underwent open heart surgery, including a heart bypass, to treat his injury that night.

Although Worrell initially survived the stabbing and the resulting medical procedures, he suffered a "rebleed a couple of weeks after the initial injury" which deprived his brain of oxygen. As a result, Worrell entered a "persistent vegetative type of state." Worrell remained in this state until his death — a period of six months.

Worrell was thirty-seven years old, approximately six feet, two inches tall and weighed about two hundred twenty pounds at the time of his injury. He weighed ninety-six pounds when he died. Dr. Tharp, who performed the autopsy of Worrell's body, testified that, because of Worrell's vegetative state, he suffered a "significant amount of atrophy" or muscle-wasting. "He was very small."

---

[1] Later forensic examination confirmed that blood matching Worrell's DNA was on Bomber's tennis shoes and a knife that police recovered in his apartment.

3

Case 7:16-cv-00171-EKD-RSB    Document 28    Filed 03/15/17    Page 3 of 16    Pageid#: 997

> Dr. Tharp further explained that Worrell's condition put him at risk for pneumonia because his constant, "prone" position could force his "stomach contents up and into [his] lungs." Dr. Tharp found pneumonia in Worrell's lungs and explained that the infection from the pneumonia had spread to his bloodstream, causing sepsis and ultimately septic shock. She further explained that the pneumonia prevented Worrell's liver from receiving adequate oxygen, and that his liver began to fail as well. Dr. Tharp concluded Worrell died from septic shock and pneumonia, but "without that initial injury [the stab wound] that caused his brain injury, he wouldn't have developed pneumonia and he wouldn't have died."
>
> At trial, Cheryl Argabright testified as a rebuttal witness for the Commonwealth regarding prior inconsistent statements Proffitt had made to her. In the days following the stabbing, Proffitt admitted to Argabright that, on the night of the stabbing, Bomber and Worrell were arguing when Worrell called Bomber a "pussy." [I]t made David [Bomber] mad and he got up, walked in the kitchen, got a knife, came back and stabbed Mike Worrell." Danny Bailey, who was incarcerated with [Bomber] at the Roanoke County/Salem Jail, also testified at trial that Bomber had admitted, "he had stabbed a guy" who had called him a "pussy." [Bomber] explained that, "he had to take him out."

*Bomber v. Clarke*, No. CL15000338, at 4-10 (Va. Cir. Ct. Jun 24, 2015) (Dkt. No. 14, Attach. 8) (internal citations omitted).[2]

On July 11, 2011, Bomber pleaded guilty to hit and run and reckless driving. On July 14, 2011, a jury found Bomber guilty of aggravated malicious wounding, second-degree murder, and three counts of assault and battery. The circuit court judge sentenced Bomber to a total active sentence of forty-one years and sixty days.[3] Bomber's direct appeals were unsuccessful, and he filed a timely petition for a writ of habeas corpus in the Circuit Court of the City of Roanoke. The circuit court denied Bomber's claims. Bomber then appealed the circuit court's denial, but the Supreme Court of Virginia refused the appeal.

On April 6, 2016, Bomber filed a petition for a writ of habeas corpus in federal court, bringing these five claims, alleging that trial counsel provided ineffective assistance:

---

[2] All internal quotations are trial testimony.

[3] On November 8, 2011, the trial court imposed the jury's sentence of twenty-five years for aggravated malicious wounding, fifteen years for second degree murder, and four months for each count of assault and battery. The court also sentenced Bomber to thirty days each for hit-and-run and reckless driving.

4

1. by failing to file a motion with the trial court to conduct further examination of Bomber's cell phone;

2. by failing to raise issues with the trial court of police and prosecutorial misconduct;

3. by failing to object to the denial of Bomber's proposed limiting instruction concerning Worrell's past medical records;

4. by failing to question witnesses prior to trial and to properly prepare an adequate defense;

5. by failing to file a motion with the trial court to set aside the verdict.

Bomber's habeas corpus petition is timely and properly before the court.

## II. DISCUSSION

### A. Standard of Review

To obtain federal habeas relief,[4] Bomber must demonstrate that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under 28 U.S.C. § 2254(d), however, the federal habeas court may not grant a writ of habeas corpus based on any claim that a state court decided on the merits unless that adjudication:

> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 403-13 (2000).

Federal courts review the merits of claims decided by the state courts under the deferential standard mandated by the Antiterrorism and Effective Death Penalty Act (AEDPA). The AEDPA standard is "highly deferential" to both factual findings and legal conclusions, and

---

[4] Bomber properly exhausted his claims on direct appeal and in state habeas; therefore, none of his claims are procedurally defaulted. *See Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) ("[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court."); 28 U.S.C. § 2254(b)(1).

5

the petitioner bears the burden of proof. *Harrington v. Richter*, 562 U.S. 86, 105 (2011); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). "Where, as here, the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Williams*, 529 U.S. at 410 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)) (emphasis in original) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Under this standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could agree on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (omitting internal quotations).

Under § 2254(d), "state-court decisions [must] be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Additionally, § 2254(d) "refers only to a 'decision,' which resulted from an 'adjudication,'" and does not "requir[e] a statement of reasons" by the state court. *Harrington*, 562 U.S. at 98. "In reviewing a habeas petition, federal courts must presume the correctness of a state court's factual determinations unless the habeas petitioner rebuts the presumption of correctness by clear and convincing evidence." *Green v. Johnson*, 515 F.3d 290, 299 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)).

**B. Ineffective Assistance of Counsel**

Bomber raises claims of ineffective assistance of counsel. To state a constitutional claim for ineffective assistance, Bomber must satisfy the two-prong *Strickland v. Washington* test by showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." 466 U.S. 668, 686-687 (1984). A petitioner must overcome "a strong presumption" that counsel's tactical decisions during the representation were reasonably competent, and the court may adjudge counsel's performance deficient only when a petitioner

6

demonstrates that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 689-90.[5]

The court must deny relief if petitioner fails to establish either of the *Strickland* prongs. Even if Bomber can establish deficient performance under this high standard, relief is unavailable unless he also shows a "reasonable probability" that, but for counsel's errors, the outcome of the proceeding would have been different. *Id.* at 694-95. Additionally, when reviewing a *Strickland* claim under the AEDPA, the court's review is "doubly" deferential. *See Harrington*, 562 U.S. at 105. Lastly, "[a]n attorney's failure to raise a meritless argument [] cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999); *see also Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996).

   1. Claim 1

In Claim 1, Bomber asserts that counsel was ineffective by failing to file a motion with the trial court to conduct further examination of his cell phone. According to Bomber, his "cell phone contain[ed] exculpatory evidence that would impeach the testimony of two adverse witnesses and corroborate the testimony of both [Bomber] and [Proffitt]." Pet'r's Br. 12, *Bomber v. Fleming*, No. 7:16CV00171, (Dkt. No. 1). On habeas review, the Circuit Court of the City of Roanoke found that Bomber "proffered no evidence that favorable data was actually on his Blackberry or any expert testimony that the data would have established his precise whereabouts . . . [Bomber] has failed to meet either prong of the *Strickland* test . . . ." *Bomber*, No. CL15000338, at 17-18 (Dkt. No. 14, Attach. 8). The court agrees with the state court's

---

[5] "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough*, 540 U.S. at 8.

7

analysis. Bomber has not supported his allegation that his cell phone contained exculpatory evidence. Instead, Bomber has repeated the conclusory statement that his phone contained exculpatory evidence without offering proof.[6] "Bare allegations and conclusions of law do not provide a suitable basis for habeas corpus relief." *Hodnett v. Slayton*, 343 F. Supp. 1142, 1145 (W.D. Va. 1972). The state court's decision was not contrary to, or an unreasonable interpretation application of *Strickland*, or based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to Claim 1.

2. Claim 2

In Claim 2, Bomber contends that counsel was ineffective for failing to raise issues at trial of police and prosecutorial misconduct. Bomber alleges that (1) "[b]oth the police and prosecutor possessed recorded telephone calls made by the defendant to his attorney," and (2) "both the police and prosecutor engaged in harassing and humiliating [Proffitt as] the defendant's only eyewitness in an attempt to deter [her] from testifying." Pet'r's Br. 10-11, *Bomber*, No. 7:16-CV-00171 (Dkt. No. 1).

For the first part of Claim 2, the state habeas court found that "[Bomber] did not have a reasonable expectation of privacy in his telephone conversations while in custody at the Roanoke County/Salem Jail. *See Belmer v. Commonwealth*, 36 Va. App. 448, 553 S.E.2d 123 (2001) (holding prisoner had no reasonable expectation of privacy in conversation recorded in jail visiting room)." *Bomber*, No. CL15000338, at 20 (Dkt. No. 14, Attach. 8). The court agrees with the state court's analysis. Bomber's claim also fails for lack of factual support. *See*

---

[6] Bomber's petition relied on a legal conclusion rather than facts: "[Bomber's] cellphone contains exculpatory evidence that would impeach the testimony of two adverse witnesses and corroborate the testimony of the defendant's only eyewitness." Pet'r's Br. 9, *Bomber v. Clarke*, No. 7:16-CV-00171 (W.D. Va. Apr. 8, 2016) (Dkt. No. 1). Bomber also included exhibits of articles discussing cell phone GPS limitations, the warrantless search of cell phones, and differences between phone analysis programs. Notably absent, however, is Bomber's explanation of the nature of the exculpatory evidence that further investigation of his phone would have discovered.

8

*Nickerson v. Lee*, 971 F.2d 1125, 1135 (4th Cir. 1992); *Hodnett*, 343 F. Supp. at 1145 (A "bare allegation" of a constitutional violation cannot be the basis of habeas relief.). Bomber did not have a reasonable expectation of privacy in his telephone conversations while in custody at the Roanoke County/Salem Jail because he was notified that all calls were recorded from the jail.[7] *See United States v. Lentz*, 419 F. Supp. 2d 820, 827-28 (E.D. Va. 2005) ("[A]n inmate's telephone conversations with counsel are not protected by the attorney-client privilege where . . . the inmate is notified at the outset that the calls are recorded and subject to monitoring.").

The second part of Claim 2 also fails on the facts. The prosecutor did tell opposing counsel that photos on Bomber's cell phone would humiliate Proffitt; however, the state habeas court held that "there is no evidence that the explicit cell phone images were ever disclosed to the jury. Furthermore, although [Bomber] alleges the police showed explicit material to Proffitt to harass or intimidate her, there is no evidence that this material had any effect on Proffitt's testimony." *Bomber*, No. CL15000338, at 18 (Dkt. No. 14, Attach. 8). The court agrees with the state court's analysis.[8] The two-part test for prosecutorial misconduct requires that: "(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the

---

[7] In his Response, Bomber stated that "[not] hav[ing] a reasonable expectation of privacy with his attorney is absurd and is tantamount to suggesting that anyone accused of a crime can no longer rely on *Miranda v. Arizona*, 384 U.S. 436 (1966)." Resp. to Mot. to Dismiss 19, *Bomber*, No. 7:16-CV-00171 (W.D. Va. Jun. 13, 2016) (Dkt. No. 19). Attorney-client privilege is not absolute; it can be waived or destroyed under several circumstances. *See, e.g.*, *Swidler & Berlin v. United States*, 524 U.S. 399, 402 (1998); *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011).

[8] Bomber claims that Proffitt was humiliated and harassed, but never offers any supporting evidence. In his Response, Bomber quotes Proffitt's trial testimony where she acknowledged that there were issues when officers questioned her. Resp. to the Mot. to Dismiss 18, *Bomber*, No. 7:16CV00171 (Dkt. No. 19). However, Bomber never substantiates his claim that Proffitt's "issues" were related to prosecutorial or police misconduct. The record does not demonstrate that Proffitt was unduly humiliated or mistreated. The prosecution did emphasize Proffitt's embarrassment over initially telling authorities that Worrell committed suicide, calling Proffitt's statement "[a] lie with a capital 'L.'" Trial Tr. at 107, *Commonwealth v. Bomber*, No. 10001020 (Va. Cir. Ct. Jul. 13, 2011) (Dkt. No. 1, Attach. 14). However, prosecutors and law enforcement stating an uncomfortable fact (that Proffitt purposefully misled investigators) was not improper and did not prejudice Bomber's defense. *See United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988).

9

defendant of a fair trial." *Brockington*, 849 F.2d at 875 (citation omitted). Bomber cannot satisfy the *Brockington* standard because Proffitt testified on Bomber's behalf and supported his self-defense claim. Bomber has not demonstrated any way that the alleged prosecutorial misconduct was (1) in fact improper, or (2) prejudicially affected Bomber so as to deprive him of a fair trial. *Cf. United States v. Golding*, 168 F.3d 700, 702 (4th Cir. 1999) (holding that a prosecutor committed misconduct by threatening a witness with prosecution on federal drug charges if witness testified in defendant's favor, so the witness felt forced not to appear).

Further, a competent defense attorney could make a reasonable, tactical choice to forego these matters in the interests of developing a substantive theory of defense. No rule, constitutional or otherwise, "compel[s] appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "[A]bsent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed v. Ross*, 468 U.S. 1, at 13 (1984) (citations removed). Bomber's counsel was not obligated to bring every potential defense, but did present (1) a self-defense theory and (2) a double jeopardy theory. Therefore, counsel's actions in reasonably, tactically choosing to forgo these issues did not deprive Bomber of a fair trial. The court will grant the motion to dismiss as to Claim 2 because the state court's finding is not contrary to, or an unreasonable interpretation of, *Strickland* and is not based on an unreasonable determination of facts.

3. Claim 3

In Claim 3, Bomber alleges that counsel was ineffective in failing to object to the denial

of the defendant's proposed limiting instruction concerning the victim's past medical records.[9] During the trial, Bomber's counsel sought to introduce Worrell's medical records into evidence, based on the theory that the records supported Bomber's self-defense claim. Counsel also requested a limiting instruction that the jury should only consider the evidence to determine who was the aggressor on June 5, 2010, and whether Bomber's fear for his safety was reasonable. At the April 1, 2011 evidentiary hearing in the circuit court, counsel proffered opinion testimony from Dr. Jeffrey Bader, a Department of Veterans Affairs ("VA") psychologist. "Dr. Bader had consulted on Worrell's treatment at the Salem, Virginia VA Hospital in February 2009 and April 2009. At that time, Worrell was in the intensive care unit at the VA hospital for alcohol dependence and alcohol withdrawal delirium, or delirium tremens." *Bomber*, No. 7:16CV00171, at 22 (Dkt. No. 19). Dr. Bader testified that: "while Worrell was a patient suffering from alcohol withdrawal, Worrell became severely agitated and had to be restrained. The records also revealed that a 'Code White' had been called during Worrell's treatment, which indicates a 'severe behavioral problem' and that, during Worrell's stay, VA police staff were called." *Id.*

When reviewing an MRI, Dr. Bader noticed that Worrell showed "micro ischemic changes" in his brain. *Id.* Further, Worrell engaged in "confabulatory speech, which . . . is typical in patients with neurological problems where the patients invent information to fill the gaps in their memories to appear normal." *Id.* Dr. Bader also noted that Worrell had "some residual neurological deficiencies, such as confusion, memory impairment, and impaired judgment in April 2009," a year before his death. *Id.* at 22-23. Dr. Bader therefore explored a diagnosis of Korsakoff's Syndrome, a neurological condition caused by alcohol abuse and vitamin deficiency, but he never conclusively diagnosed Worrell, stating that the "neurological

---

[9] In Claim 3, Bomber only argues that counsel was ineffective for failing to object to the denial of the proposed limiting instruction, but the court has also construed his claim to include a review of the exclusion of the evidence.

11

symptoms could have been caused by the ischemic changes, the heavy sedation [Worrell] experienced during his alcohol detoxification treatment, or Worrell's pre-existing liver damage." *Id.* at 23. The doctor testified that during Worrell's participation in the VA program, however, Worrell made a "'remarkable recovery' and voluntarily participated in the VA's twenty-eight day, in-patient substance abuse program. To participate in the . . . program, [Worrell had to] successfully pass a cognitive screening." *Id.* Although some behavior issues arose during the course of Worrell's treatment, Dr. Bader testified that "alcohol withdrawal symptoms are not chronic, and that, were a patient actually consuming alcohol, he would not exhibit symptoms of alcohol withdrawal."[10] *Id.*

After hearing the evidence, the circuit court concluded that Worrell's medical records were irrelevant to Bomber's defense "unless there was evidence Worrell was undergoing alcohol withdrawal, and heavily sedated with intravenous benzodiazepines" when he encountered Bomber. *Id.* In Bomber's Response, he disputes the state court's analysis by citing *Karnes v. Commonwealth*, 99 S.E. 562 (Va. 1919) ("declarations indicting [victim's] state of mind are generally admissible"), and *Washington v. Texas*, 388 U.S. 14 (1967) (state statute precluding a witness's testimony violated the Sixth Amendment), but neither of these cases support Bomber's position. The circuit court acknowledged, and Bomber argues at length, that evidence of intoxicated behavior can be relevant to a crime committed while intoxicated.[11] However, during treatment in the VA program, Worrell's "state of mind" was related to alcohol withdrawal, not active intoxication. Since Worrell was not suffering from symptoms of alcohol withdrawal

---

[10] "Dr. Bader testified, and [the Circuit Court of the City of Roanoke] found, that Worrell's disruptive behavior occurred while Worrell was in the intensive care unit undergoing alcohol detoxification, suffering from alcohol withdrawal, and heavily sedated with intravenous benzodiazepines." *Id.* at 23-24.

[11] *See Barnes v. Commonwealth*, 214 Va. 24, 197 S.E.2d 189 (1973) (holding when there is evidence that the victim was intoxicated at the time of the shooting, evidence of his character or reputation for turbulence when in such condition is admissible on the issue of self-defense).

12

and/or heavy sedation on June 5, 2010, Worrell's alcohol withdrawal symptoms were irrelevant to Bomber's self-defense theory.[12] Therefore, the court agrees with the Circuit Court of the City of Roanoke's analysis: the trial court correctly excluded the proffered evidence.

Further, Bomber's limiting instruction was unnecessary, as the medical records were not admitted. Under *Strickland*, "[a]n attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue. *Kimler*, 167 F.3d at 893 (citing *Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994)). Bomber has not supported his claim that counsel's performance was constitutionally deficient, and the state court's decision was not contrary to, or an unreasonable application of, *Strickland*, or an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to Claim 3.

4. Claim 4

In Claim 4, Bomber argues that counsel was ineffective by (1) failing to question witnesses prior to trial, and (2) failing to properly prepare an adequate defense. Bomber supports his contention with "exhibits and the lack of witnesses who testified for the defense."[13] Pet'r's Br. 11, *Bomber*, No. 7:16CV00171 (Dkt. No. 1). Bomber states that witnesses, if interviewed, would have offered exculpatory evidence. However, Bomber never supported his claim with affidavits detailing the witnesses' expected favorable testimony.[14] *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must

---

[12] The trial court did allow Proffitt's testimony regarding Worrell's post-traumatic stress disorder.

[13] In his Response to the Motion to Dismiss, Bomber alleged that counsel was ineffective for failing to interview the Hartwells, Cheryl Argabright, and Bomber's neighbor at the time of the stabbing, Jim McHugh because "favorable evidence" and "impeachment evidence" were both available. Resp. to the Mot. to Dismiss 22, *Bomber*, No. 7:16CV00171 (Dkt. No. 19).

[14] In his state habeas proceedings, Bomber did not offer any actual affidavits from potential witnesses, with the exception of Melissa Hartwell, whose affidavit was consistent with her trial testimony. *Bomber*, No. CL 15000338, at 29 (Dkt. No. 14, Attach. 8).

13

generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim."); *see also Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994) ("Without a description of the subject matter of the potential testimony, [Petitioner] has not raised a cognizable claim under *Strickland*."). Further,

> without a specific, affirmative showing of what the missing evidence or testimony would have been, "a habeas court cannot even begin to apply *Strickland*'s standards" because "it is very difficult to assess whether counsel's performance was deficient, and nearly impossible to determine whether the petitioner was prejudiced by any deficiencies in counsel's performance."

*Anderson*, 18 F.3d at 1221 (quoting *Alexander v. McCotter*, 775 F.2d 595, 602-03 (5th Cir. 1985)). Thus, Claim 4 does not satisfy *Strickland's* prejudice prong, because Bomber failed to show what the witnesses would have said had counsel interviewed and called them. *United States v. Debango*, 780 F.2d 81, 86 (D.C. Cir. 1986) (Petitioner failed to demonstrate prejudice after he never introduced evidence of the uncalled witness's testimony.).

The state court also found that Claim 4 did not overcome the presumption that counsel made a reasonable tactical decision when he did not call or interview the witnesses. "[T]he lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand . . . ."). Since Bomber has failed to show that the state court's decision was contrary to, or an unreasonable application of, *Strickland*, or that the decision was based on an unreasonable determination of facts, the court will grant the motion to dismiss as to Claim 4.

14

5. Claim 5

In Claim 5, Bomber alleges that counsel was ineffective in failing to move the trial court to set aside the verdict. The state habeas court found that Bomber had not satisfied either prong of *Strickland*:

> Counsel properly moved to strike the Commonwealth's evidence both at the conclusion of the Commonwealth's case-in-chief and at the conclusion of all of the evidence. Counsel renewed his arguments in the motion to strike by way of an oral motion to set aside the verdict at the conclusion of the case, which the Court deemed a motion to dismiss. The trial court denied the motion. [Bomber] has not established that another post-trial motion challenging the sufficiency of the evidence would have resulted in a different outcome.

*Bomber*, No. CL15000338, at 36 (Dkt. No. 14, Attach. 8) (internal citations removed). The court agrees with the Circuit Court of the City of Roanoke. Counsel is not required to pursue every possible defense. *See, e.g.*, *Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."); *Williams v. Kelly*, 816 F.2d 939, 950 (4th Cir. 1987). Counsel may not have argued every potential motion, defense, or claim available, but counsel did present Bomber's self-defense claim and double jeopardy defense. Counsel reasonably saw those defenses as the strongest claims, and pursued them vigorously. *See Williams*, 816 F.2d at 950. ("Counsel is not ineffective merely because he overlooks one strategy while vigilantly pursuing another."). Bomber has failed to establish that the state court's decision was contrary to, or an unreasonable interpretation of, federal law, or based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to Claim 5.

### III. CONCLUSION

For the reasons stated, the court will grant the motion to dismiss Bomber's § 2254 petition. All claims are without merit.

15

Case 7:16-cv-00171-EKD-RSB   Document 28   Filed 03/15/17   Page 15 of 16   Pageid#: 1009

An appropriate order will enter this day.

Entered: March 15, 2017.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge